UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

ARMON HILL,

      Plaintiff,

                                         Case No. 2:20-CV-12537
                                         Hon.
                                         Mag.

v.

WASHTENAW COUNTY PROSECUTOR'S
OFFICE (WCPO) and BRIAN MACKIE
(professional and individual capacity),

      Defendants.
_____/

WEBSTER LAW OFFICE, PLLC
Dionne E. Webster-Cox (P70422)
Counsel for Plaintiff
33150 Schoolcraft – Ste. 201
Livonia, MI 48150
(734) 215-2444 / (734) 943-6069 – FAX
DEWC@WebsterLawOfficePLLC.com

SPECTRUM LEGAL SERVICES
Michael H. Fortner (P46541)
Co-Counsel for Plaintiff
24100 Southfield Ste. 203
Southfield, MI   48075
(248) 432-7436
fortner@SpectrumAttorneys.com
_____/

**COMPLAINT AND JURY DEMAND**

Plaintiff states the following:

1.     This action arises pursuant to the Fifth Amendment of the United States Constitution,

which specifically confers jurisdiction on this court.

**INTRODUCTION**

This Civil Action arose out of the unlawful use of the Investigative Subpoena by the Washtenaw County Prosecutor's Office (WCPO), under the direction of Brian Mackie in his individual and official capacity as the Washtenaw County Prosecuting Attorney.

## JURISDICTION AND VENUE

2.   This Court has jurisdiction to hear the federal civil rights violations in this matter under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3)-(4) and supplemental jurisdiction to hear the common law claims under 28 U.S.C. § 1367.

3.   Venue is proper in the U.S. District Court for the Eastern District of Michigan, pursuant to 28 U.S.C. § 1391(b)(2), in that this is the judicial district in which the events giving rise to the claim occurred.

4.   The amount in controversy exceeds $75,000, exclusive of interest and costs.

## PARTIES AND BACKGROUND FACTS

5.   The Plaintiff in this action, Mr. Armon Hill, at the time of the occurrence was a 19-year-old, African American male who was subjected to the unlawful use of an investigative subpoena as executed by the WCPO.

6.   Plaintiff was subject to both racial profiling and disparate treatment at the hands of the WCPO.

7.   Plaintiff Hill was imprisoned for exercising his Fifth Amendment rights protecting him from self-incrimination, pursuant to the unlawful execution of the WCPO's investigative subpoena.

8.   Before he was imprisoned, Plaintiff Hill was a resident of Canton, Michigan and had a steady job working at Little Caesars.

9.    He was not well paid at Little Caesars and comes from a family of modest means.

10.	Defendant WCPO is a municipal governmental agency funded, in part, by Washtenaw County.

11.	Defendant Brian Mackie is the duly-elected prosecutor for the WCPO.

12.	On July 26, 2019 Andre Smith was murdered at a pool party in Ypsilanti, MI.

13.	On July 26, 2019 Plaintiff Hill was a passenger in Benjamin Craft's vehicle.

14.	Plaintiff Hill's connection to the murder was that he was in the same vehicle with four other people that attended the pool party in Ypsilanti.

15.	On August 14, 2019 Benjamin Craft had confessed to the shooting of Mr. Smith during a prosecutorial interview, which was conducted under the guise of an investigative subpoena.

16.	On August 16, 2019, Mr. Craft was formally charged with the following crimes: Open Murder, Assault with the Intent to Murder, Weapons – Carrying w/unlawful intent, Weapons – Carrying concealed, Assault w/ dangerous weapon, and four counts of Weapons – Felony Firearm.

17.	In October of 2019, under the authority of an investigative subpoena, Plaintiff Hill had been ordered to appear before the Washtenaw County Prosecutor's Office on October 8, October 18, and October 29, 2019.

18.	On each occasion Plaintiff Hill was interviewed by Assistant Prosecuting Attorney John Vella.

19.	The Washtenaw County Prosecutor's Office had been investigating the July 26, 2019 homicide of Mr. Smith, wherein Plaintiff Hill had been allegedly brought in under the auspices of being a material witness to the felonies of open murder, assault with intent to murder, carrying a concealed weapon, and felony firearm regarding Mr. Smith's homicide.

20.     Before the assistant prosecutor began questioning, Plaintiff Hill had been duly informed of his statutory rights and constitutional rights under MCL 767A.5. Specifically, the assistant prosecutor stated "You may refuse to answer any question if a truthful answer to the question would tend to incriminate you" and that "[a]nything that you do say may be used against you by prosecutors in subsequent legal proceedings". Exhibit 1 - Tr. 4:18-22, Oct. 29, 2019.

21.     After Plaintiff Hill was apprised of his legal rights under the statutory provisions, the assistant prosecutor began the interview. Plaintiff Hill had answered each question presented to him by the assistant prosecutor until Plaintiff Hill was asked "where did you go to park? Did you park right on the – the street there?" Exhibit 1 - Tr. 19:23-24, Oct. 29, 2019.

22.     In response, Plaintiff Hill stated that he had already answered the question, that he refused to answer it again, and that he "[pled] the Fifth", stating that the assistant prosecutor could "*axe (sic) [him] something different*" and that if the assistant prosecutor would "axe (sic) [him] something different [he] will answer" but that he would not answer the same questions again. Exhibit 1 - Tr. 20:2, 4, 8-9, Oct. 29, 2019 (emphasis added).

23.     First introduced in Michigan in 1995, investigative subpoenas were to be issued in an effort to break down the wall of silence that surrounds criminal investigations, being used by authorities who are seeking information from witnesses who are unwilling to provide statements and testify before law enforcement officials.

24.     These subpoenas are used by authorities to summon witnesses to an inquiry when authorities do not have a suspect.

25.     In this case, WCPO had someone in custody, Mr. Craft, who had confessed to the murder of Mr. Smith and was charged.

26.     During Mr. Craft's interview, he implicated Plaintiff Hill as being in possession of a firearm.

27.     As would logically follow, Plaintiff Hill would have, naturally, become a suspect to the crime.

28.     Thus, the WCPO would not be able to conduct an interview with Plaintiff Hill under the authority of an investigative subpoena because he would have been considered a suspect.

29.     During an honest investigative subpoena inquiry, the witnesses are placed under oath and, if they lie, can be charged with perjury.

30.     Investigative subpoenas are a powerful tool wielded by the prosecutor's office in an effort to encourage and, in some instances, compel an uncooperative witness into providing testimony about the crime in question, while giving them the cover that they are being compelled to do so by the authorities if they have reservations about providing testimony against a friend, relative, or criminal organization.

31.     Similar to grand jury inquiries, these investigative subpoena inquiries are supposed to be confidential and only between the lead police investigator, the assignment prosecutor, the witness, and the witness's attorney.

32.     Plaintiff Hill's inquiry was conducted and taped in a video-recorded courtroom with a court reporter present.

33.     Upon information and belief, the courtroom staff in the back can also view and hear the investigative subpoena inquiry.

34.     The investigative subpoena process is supposed to guarantee secrecy, with the effect of protecting witnesses who may be too scared to testify.

35. The WCPO had issued an investigative subpoena to Plaintiff Hill in September 2019 when Mr. Craft had already confessed to the murder of Mr. Smith a month earlier.

36. The WCPO had issued an investigative subpoena to Plaintiff Hill, not as a means to compel the testimony of an uncooperative witness, but as an attempt to implicate him in a crime, of which he was not involved.

37. This attempt to implicate Plaintiff Hill in a crime was accomplished by the prosecutor's office through a series of completely inappropriate questions that were unrelated to the crime being investigated and were only designed to implicate Plaintiff Hill in the murder of Mr. Smith.

38. Here is a list of just a few of the following inappropriate questions from the Investigative Subpoena Transcript taken on October 29, 2019 to establish that Plaintiff Hill was treated as a suspect and *not* a witness, as Plaintiff Hill was led to believe:

> a) "How – how have you communicated with Jlonte Booker?"
> b) "What about Instagram?"
> c) "Okay. What about Instagram or social media, email, anything like that?"
> d) "So you had everybody's phone number in the vehicle?"
> e) "Okay. Do you recall what the Instagram screen names were of Benjamin Craft?"
> f) "No, the screenname that he used?"
> Exhibit 1 - Tr. 13:8-9, 13-14; 14:5-6, 15-16, 22-23, 25, Oct. 29, 2019.

39. These are just some of the many questions that were designed to establish some type of pre-meditation, planning, or co-conspiracy between Plaintiff Hill and the passengers in the vehicle concerning the homicide of Mr. Smith.

40. As a result of the abuse of the investigatory subpoena, Plaintiff Hill had validly and properly invoked his Fifth Amendment right protecting him against self-incrimination.

41. In spite of this valid invocation, and without a full review of his testimony nor a formal proceeding to determine whether his invocation was valid, on October 29, 2019 Plaintiff Hill had

been found, by the judge who originally authorized the investigative subpoena, to be in contempt and sentenced to a term in jail not exceeding 6 months.

42. Plaintiff Hill was not granted immunity prior to testifying at the interview.

43. In fact, on October 18, 2019 APA Vella wanted Plaintiff Hill to testify as to the happenings of July 26, 2019, only then would he consider offering immunity.

44. Plaintiff Hill was allegedly ordered to appear simply as a witness to the homicide, however the line of questioning presented treated the interview as an interrogation of a suspect.

45. Most of the questions presented on October 29, 2019 were not germane to Plaintiff Hill being a witness to the homicide or to the events leading up to it.

46. The interview was scheduled to be on September 26, 2019, and Plaintiff Hill made an appearance on that date.

47. On that date, Plaintiff Hill exercised his right to ask for a lawyer to represent him while he was being questioned. The interview was rescheduled for October 8, 2019.

48. On October 8, 2019, Plaintiff Hill returned to court with his former attorney. Plaintiff Hill answered questions until his former attorney had to leave, cutting the interview short.

49. On October 18, 2019, Plaintiff Hill again returned to court to continue the interview.

50. Plaintiff's counsel did not have the opportunity to review what Plaintiff Hill had said on October 8, 2019 when his former attorney was present.

51. During the October 18, 2019 interview, the assistant prosecutor called the interview a "hearing" on accident, which can be interpreted as a Freudian slip.

52. On October 18, 2019 Plaintiff Hill invoked his Fifth Amendment right protecting him from self-incrimination.

53. The Fifth Amendment states that "[n]o person shall . . . be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law . . . ."

54. The October 18, 2020 interview was adjourned so that Plaintiff's counsel and the assistant prosecutor could meet and view Plaintiff's previously video recorded testimony.

55. A new interview was scheduled for October 29, 2019 before Judge David S. Swartz.

56. Plaintiff Hill again arrived at the courtroom to be interviewed.

57. The assistant prosecutor began his questioning from the beginning, re-asking many of the questions he had asked previously to Plaintiff Hill.

58. After answering several questions, Plaintiff Hill again asserted his Fifth Amendment right not to be a witness against himself.

59. Plaintiff Hill had fully complied with the Prosecutor that day, answering any questions he had, up until this point.

60. Plaintiff Hill asserted this right when he believed answering the Prosecutor's question may implicate him in a crime.

61. Plaintiff Hill reasonably and in good faith believed that answering the Prosecutor's question might have implicated him in a crime.

62. Plaintiff Hill felt that he could not answer certain questions about the date in question without the possibility of implicating himself. Plaintiff Hill did, however, offer to answer questions he felt he could answer.

63. After asserting his Fifth Amendment right not to answer a specific question, Plaintiff Hill stated "if you axe (sic) me something different I will answer."

64.     After Plaintiff Hill made this statement, the prosecutor never attempted to ask Plaintiff Hill a different question.

65.     When Plaintiff Hill asserted his Fifth Amendment rights, the prosecutor did not even attempt ask a different question, and instead went to meet with Judge Swartz and the interview was in recess.

66.     When a person asserts their Fifth Amendment right not to be a witness against themselves while complying with an investigative subpoena, procedures must be followed to determine if they can assert their Fifth Amendment rights.

67.     MCL § 767A.6 states that:

> (1) If a person files an objection to, or fails or refuses to answer any question or to produce any record, document, or physical evidence set forth in an investigative subpoena, the prosecuting attorney may file a motion with the judge who authorized the prosecuting attorney to issue the subpoena for an order compelling the person to comply with that subpoena. The prosecuting attorney shall serve notice of the motion under applicable court rules.

> (2) If the prosecuting attorney files a motion with the court for an order under subsection (1), the court shall hold a hearing on the motion. The person has the right to appear and be heard regarding the motion and to have legal counsel present.

> (3) If the court determines the question or evidentiary request of the prosecuting attorney is appropriate and within the scope of the authorization, the court shall order the person to answer the question or to produce the record, document, or physical evidence.

> (4) If the court determines the question or request is inappropriate or outside the scope of the authorization, the court may order the prosecuting attorney to modify the question or the request or may disallow the question or the request.

> (5) **The court shall not compel the person to answer a question or produce any record, document, or physical evidence if answering that question or producing that record, document, or physical evidence would violate a statutory privilege or a constitutional right.** Upon motion by the person and for good cause shown, the court may make any further order in the proceedings that justice requires to protect the person from unreasonable annoyance, embarrassment, oppression, burden, or expense.

(Emphasis added.)

68.     After the recess, Judge Swartz entered the courtroom.

69.     While the prosecutor was re-introducing the case to Judge Swartz, he was the victim of another Freudian slip. The assistant prosecutor called Ms. Webster-Cox Plaintiff Hill's "Defense Attorney." At this point in time, Plaintiff Hill had not been charged with any crimes and was not in need of a Defense Attorney.

70.     Upon information and belief, the assistant prosecutor considered Plaintiff Hill a suspect.

71.     The assistant prosecutor then claimed that Plaintiff Hill refused to answer any further questions that may be presented to him, even though Plaintiff Hill has previously stated that he would answer different questions.

72.     The assistant prosecutor then asked Judge Swartz to hold Plaintiff Hill in contempt of court.

73.     The assistant prosecutor further requested that the hearing be held "now."

74.     Judge Swartz asked the assistant prosecutor to ask Plaintiff Hill a question.

75.     In the presence of Judge Swartz, the assistant prosecutor again asked the same question Plaintiff Hill had previously declined to answer.

76.     The assistant prosecutor did not ask Plaintiff Hill any alternative questions.

77.     Plaintiff Hill was found in contempt of court based on his refusal to answer the same question that he had asserted his fifth amendment rights on.

78.     Plaintiff Hill was not given the opportunity to explain why he believed answering would violate his Fifth Amendment rights or the opportunity to answer any other questions.

79.     Plaintiff Hill was found to be in contempt of court and sentenced to six months in jail and told that if he answered the assistant prosecutor's questions, he would be released and that "the keys to the jail" was in his pocket.

80.     While "the keys to the jail" may have been in his pocket in this instance, turning the key would have only led him into another cell. One does not truly have the ability to free themselves if doing so could potentially implicate them in a larger crime.

81.     Plaintiff Hill had and has the right to assert his Fifth Amendment right not to testify against himself.

82.     Plaintiff Hill asserted his privilege against self-incrimination because answering the questions supported a potential conviction and also furnished a link in the chain of evidence needed to prosecute him for crime.

83.     In fact, prior to the interview, the assistant prosecutor enumerated Plaintiff Hill's rights, including that **against** self-incrimination.

84.     Plaintiff Hill had three options:

        a.  Tell the truth and get charged with a crime;

        b.  Get charged with perjury; or

        c.  Assert his 5th Amendment right against self-incrimination and get held in contempt of court.

85.     Upon information and belief, Plaintiff Hill was punished for exercising his Fifth Amendment rights.

86.     Defendants ultimately charged Plaintiff Hill with perjury.

87.     Upon information and belief, Plaintiff Hill was discriminated against due to his race.

88.     Upon information and belief, if Plaintiff Hill was white he would not have been treated so poorly and dehumanized by the WCPO.

89.     Upon information and belief, WCPO has a policy or custom to use the investigative subpoena as a weapon to violate the due process rights of young African Americans and contrary to the spirit in which the law of the investigative subpoena was written.

90.     Plaintiff requested a copy of the petition under which the investigative subpoena was issued and was denied by Defendant WCPO. (Exhibit 1)

91.     The investigative subpoena in its title and on its face implies some type of investigation.

92.     Plaintiff Hill's investigative subpoena was requested by the WCPO for the purpose of investigating the death of Andre Smith.

93.     Requesting the investigative subpoena places WCPO out of the "quasi-judical" immunity and opens the door for investigatory activities normally performed by laymen, such as police officers.

94.     Defendant WCPO through policies and customs acted in the role of a policeman and deprived Plaintiff Hill of rights, privileges, or immunities secured by the Federal Constitution and laws.

95.     Defendants WCPO and Brian Mackie are not entitled to absolute immunity, because its policy and customs to use the investigative subpoena to deprive African Americans of their civil rights removes Defendants absolute immunity.

96.     This present suit is differentiated from Hancock v. Washtenaw County Prosecutor's Office, et. al. (548 F. Supp. 1255) in that this complaint challenges the policy and customs that target minorities with the improper use of the investigative subpoena resulting civil rights violations.

## COUNT I -Monell Violation- Policy and Customs

97.     Plaintiff reincorporates the allegations set forth above.

98.     An individual has a constitutional right not to be forced to be a witness against themselves under the Fifth Amendment of the Constitution.

99.     An individual has a constitutional right to be treated equally under the laws of the United States under the Fourteenth Amendment.

100.    Execution of a governmental policy, custom, or practice – whether made by lawmakers or by those whose edicts or acts may fairly be said to represent official policy – which inflicts injury, subjects government entities (such as the Washtenaw County Prosecutor's Office) to responsibility under 42 U.S.C. § 1983. Moreover, any acts performed pursuant to some type of custom or practice that may not have been formally approved, but which became so widespread as to take on the force of law also subjects the Washtenaw County Prosecutor's Office to liability under Section 1983.

101.    There exists a policy, custom or practice in the Washtenaw County Prosecutor's Office of targeting people who are minorities and denying them their civil rights through the improper use of the investigative subpoena.

102.    The Washtenaw County Prosecutor's Office is responsible for numerous acts and/or omissions of the Washtenaw County Prosecutor's Office including, but not limited to a duty to (1) properly train, monitor, and supervise the Prosecutors , (2) not to hire and/or retain personnel who were incompetent, negligent, and/or reckless, (3) prevent the unlawful deprivation of minorities' civil rights. Defendant Washtenaw County Prosecutor's Office's failure in that duty was a proximate cause of the injuries sustained by the plaintiff.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter an award in the amount of $75,000.00 for damages in his favor, along with appropriate declaratory and injunctive relief, an award of punitive damages in the amount of $5,000,000.00, an award of costs and attorney fees, interest, and any other relief as may be applicable.

### COUNT II- Monell Violation – Brian Mackie- Policy Maker

103.    Plaintiff reincorporates the allegations set forth above.

104.    A supervisory official is liable under 42 U.S.C. § 1983 when he implements a municipality's custom, practice or procedure, and the implementation of those customs, practices, or procedures is a proximate cause of the Plaintiff's injuries.

105.    Defendant Brian Mackie was directly responsible for implementing the policies, procedures, customs and practices which had developed and were in place at the Washtenaw County Prosecutor's Office prior to and during the events made the subject matter of this litigation.

106.    Defendant Brian Mackie through his assistant prosecutor was responsible for interviewing Plaintiff Hill at all times related to the investigative subpoena.

107.    Defendant Brian Mackie through his assistant prosecutor was the prosecutor that requested the investigative subpoena for Plaintiff Hill.

108.    Defendant Brian Mackie through his assistant prosecutor was the prosecutor that requested the court hold Plaintiff Hill in contempt.

109.    During his time at the WCPO, Defendant Brian Mackie was responsible for overseeing and supervising all other assistant prosecutors in the Washtenaw County Prosecutor's Office.

110.    Some of the acts and omissions for which Defendant Brian Mackie is responsible for include, but are not limited to, (1) failure in his duty to properly exert control over and supervise

the other prosecutors at the WCPO, (2) failure in their duty to train the other prosecutors in the WCPO

111. Defendant Mackie knew that his policies would cause injury to Plaintiff Hill.

112. Plaintiff's injury resulted in depression, emotional and physical distress, mental and physical anguish, humiliation, loss of reputation and embarrassment, and the physical manifestations of these problems.

113. Defendant Mackie violated Plaintiff's civil rights by creating and implementing policies that resulted in Plaintiff receiving disparate treatment from other White suspects similarly situated.

PLAINTIFF REQUESTS that this court enter judgment against Defendants in an amount in excess of $100,000.00 that he may be found to be entitled, together with interest, costs, attorney fees and other relief that the court deems just under the circumstances.

Respectfully submitted,

Dated: September 02, 2020

/s/Dionne E. Webster-Cox___
Dionne E. Webster Cox
Counsel for Plaintiff
33150 Schoolcraft – Ste. 201
Livonia, MI 48150
(734) 215-2444 / (734) 943-6069 – FAX
DEWC@WebsterLawOfficePLLC.com